IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Jason D. Warner,                                              Case No. 22-cv-01345

          Petitioner,

      v.                                                              **ORDER**

Kim Henderson,

          Respondent.

This is a prisoner habeas corpus case under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA") 28 U.S.C. § 2254. Petitioner Jason D. Warner, a former Marion County, Ohio Common Pleas Judge, seeks relief from a twenty-four-month sentence through his habeas Petition.

Petitioner filed his Petition on July 29, 2022. (Doc. 1). He alleges three grounds for relief: 1) there was insufficient evidence to support his convictions; 2) the verdicts were a legal impossibility, contrary to law, and violated his rights to due process and a fair trial; and 3) the trial court's repeated misconduct violated his rights to due process and a fair trial. (*Id.*).

Respondent, Kim Henderson, Warden of the Toledo Correctional Institution, filed a Return of Writ (Doc. 7) and Petitioner filed a Traverse (Doc. 11).[1]

---

[1] Concurrently with filing the Writ, Petitioner filed a Motion for Stay of Execution of Sentence pursuant to 28 U.S.C. § 2251. (Doc. 3). After referral to Magistrate Judge Amanda Knapp under N.D. Ohio Loc. R. 72.2 and review of her Report and Recommendation, I denied the motion. I remanded the matter back to Magistrate Judge Knapp for a recommendation on the merits of the Writ.

I recently withdrew the referral to the Magistrate Judge and held a status conference with counsel. Petitioner has completed his two-year sentence and is now on parole. Being on parole satisfies the in-custody requirement. *See DePompei v. Ohio Adult Parole Auth.*, 999 F.2d 138, 140 (6th Cir. 1993).

For the reasons explained below, I deny the Petition and I deny a certificate of appealability.

## Background

The Ohio Court of Appeals set forth the facts, in part, as follows:

{¶2} On June 4, 2020, just after midnight, the record indicates that Jason's wife, Julia Warner ("Julia"), was driving a black Jeep Wrangler southbound on SR 203 with Jason in the passenger seat. At the same time, Colton G. was driving northbound on SR 203 in a BMW X3. As both vehicles approached CR 106, also known as Somerlot Hoffman Road, Julia attempted to make a left turn onto CR 106 without yielding to Colton's vehicle. The Warners' Jeep Wrangler struck the left front of Colton's BMW, causing the BMW to travel off the right side of the road and strike a utility pole. The wreck resulted in serious damage to Colton's vehicle and trapped him, semi-conscious, inside.

{¶3} Some nearby residents in the rural area heard the crash and saw a male and female—the Warners, who were not known to the witnesses—walking around the crash site and looking into the damaged BMW. Julia was observed to have her hand over her mouth by one witness. Shortly thereafter, the witnesses saw the black Jeep Wrangler drive away from the scene of the accident prior to the arrival of law enforcement.

{¶4} One of the nearby witnesses approached the scene after the Jeep Wrangler left and saw that Colton's vehicle was smoking and noisy. Colton himself was trapped in his vehicle, bloody, and semi-conscious. One witness called 911 and emergency services responded. Colton had to be extracted from his vehicle with a "hydraulic spreader," also known as the "jaws of life," before being taken to the hospital.

{¶5} Meanwhile, the Warners went home, leaving marks in the roadway and their driveway where the vehicle's rim was scraping the pavement through a deflated tire. A neighbor of the Warners was out walking and heard their vehicle making a lot of noise coming up the street. He saw the Warners' Jeep pull into their garage and close the door, though the neighbor did not see who was driving.

{¶6} The Warners did not contact anyone regarding the accident until approximately nine hours later, when they approached law enforcement together to accept responsibility for the accident. At that time, and over the ensuing weeks, Julia made multiple statements indicating that she was driving during the accident, that she thought there was a stop sign in the other direction, and that she misjudged the turn in the dark and the rain. When law enforcement investigated the matter, virtually all of the evidence pointed to Julia driving at the time of the crash, such as the bruising on her body consistent with the driver's-side seatbelt, her DNA on the driver's-side airbag, and Jason's DNA on the passenger's-side airbag. As for his part, Jason initially told a coworker that he had basically been "passed out" or

"asleep" through the whole incident, though he later acknowledged to the same coworker that he had gotten out of the Jeep Wrangler at the scene, as other witnesses had claimed.

{¶7} On September 9, 2020, a joint indictment was filed against Jason and Julia[.] […] Jason and Julia pled not guilty to the charges. They also waived a jury trial and elected to proceed to a bench trial, with a visiting judge assigned to preside over the matter.

{¶8} Prior to trial, the parties entered into a number of stipulations, which included the authenticity of various lab reports, photographs, medical records, phone records, etc. In addition, the Warners also agreed to stipulate that Colton suffered serious physical harm as a result of the accident, obviating the need for testimony from a significant number of medical professionals.

{¶9} The Warners' bench trial was held March 8-10, 2021. […] At the conclusion of the trial, the trial court noted that it did not have to provide any reasoning to support its general findings; nevertheless, the trial court made some statements regarding the evidence on the record. Ultimately, the trial court found Julia and Jason guilty of Count 3 of the indictment, "Leaving the Scene of an Accident/Complicity" in violation of R.C. 2923.03(A)(2) and R.C. 4549.02(A)(1)/(B)(2)(b), a fourth degree felony, and Count 4 of the indictment, "Tampering with Evidence/Complicity" in violation of R.C. 2923.03(A)(2) and R.C. 2921.12(A)(1), a third degree felony.

*State v. Warner*, No. 9-21-15, 2021 WL 5563502, at *1-2 (Nov. 29, 2021) (footnotes omitted).

The Court of Appeals later set forth more details regarding the evidence presented at trial:

{¶18}[…] [O]n the evening of June 3, 2020, Jason and his wife, Julia, went to the residence of Todd and Kimberly Anderson for a social gathering. The Warners and the Andersons were very close friends, and had been for years. Kimberly Anderson was having a female friend visit from out-of-town, so she was hosting a gathering that Julia was attending. Jason was planning on attending a separate social gathering with Todd that evening.

{¶19} The Warners arrived at the Andersons' residence around 6:00 p.m. At that time, Todd Anderson was not home. However, shortly after Todd arrived home around 6:30 p.m., Todd and Jason left the Andersons' residence and went to their own social gathering at the home of Rob Lust. Todd, Jason, Robb, and others were part of a group planning a "cigar smoker," a cigar-related event. (Tr. at 223). While at Rob Lust's home, Todd had a few drinks and he thought Jason might have had a drink but Todd was unsure. Regardless, Todd and Jason returned to the Andersons' residence between 11:30 and 11:45 p.m.

3

{¶20} Meanwhile, at the Andersons' residence, Julia and Kimberly were drinking wine and snacking. Julia admitted to having three drinks throughout the evening, claiming that her last drink was at 9:30 or 10 p.m. Kimberly's guests at the social gathering, other than Julia, left around 10-10:30 p.m. Julia stayed at the Andersons' residence until Jason returned with Todd. At that time, the Warners left together, with Julia driving the black Jeep Wrangler they owned. The Warners' home was approximately a 15-20 minute drive.

{¶21} On the ride home, Julia was driving south on SR 203 approaching an intersection with CR 106, also known as Somerlot Hoffman Road. The area was relatively rural. Julia slowed down to make the turn onto Somerlot Hoffman Road from 25 mph to 12 or 13 mph. However, she failed to yield to a driver coming north on SR 203 before she made her turn. Julia would later claim that she thought there was a stop sign in the opposite direction, and, alternatively, that she misjudged the turn. Regardless of the reason, the Warners' vehicle struck a BMW X3 being driven by Colton G. The collision caused Colton to veer off the road into a telephone pole. Colton's vehicle was seriously damaged to the point that the engine compartment on the left side was shifted toward the passenger compartment. (State's Ex. 23). Colton was trapped inside the vehicle.

{¶22} Jennifer Mehaffey resided […] approximately 185 yards south of the crash intersection. At the time of the crash, Jennifer's daughter, Ashtan, and her boyfriend, Marquis, were on the front porch of the residence. Marquis saw Colton's silver vehicle drive past the residence, then he heard the crash at the intersection. Marquis stated he did not have a clear view of the intersection from the porch due to the angle.

{¶23} When he heard the crash, Marquis stepped off the porch and moved toward the intersection. As he did, he saw two people outside of the damaged vehicles: a woman who had her hands to her face looking into the silver crashed vehicle, and a man. Ashtan testified that she also saw a male and a female outside of the crashed vehicles.

{¶24} Ashtan notified her mother Jennifer of the incident, who was upstairs when it happened, and Ashtan called 911. Jennifer came outside and saw someone circling the damaged vehicle, although she thought she saw a male get out of the driver's side of the Jeep and get into the passenger side of the Jeep Wrangler.

{¶25} Seeing the male and female together at the crash site from a distance, Marquis thought that the two must be exchanging information from the accident, and that they had the situation handled, so he changed direction and began walking back toward the porch. However, shortly thereafter, the Jeep Wrangler left the scene of the accident and the individuals were gone. When Marquis realized that both individuals from the scene were gone, yet one vehicle was still present, he ran to the damaged vehicle.

{¶26} Another individual, Keith Bentley, lived slightly closer to the rural intersection where the accident occurred, but to the north of it, and he also heard the crash. At the time of the crash, Keith was sitting in his living room watching television when he heard a "loud pop." (Tr. at 64). He went to his door and saw two vehicles, one of which had struck the pole on his property. The pole was approximately 85 yards away from Keith at that time.

{¶27} Keith walked out of his house to the southern portion of his driveway and he saw a male figure walking around the crashed vehicle. Keith went back into his house to get flashlights and a raincoat, but as he did, the Jeep Wrangler left the scene. Keith did not see a second person at the crash site, and he did not see who was driving when the Jeep Wrangler departed.

{¶28} After the Jeep Wrangler left the scene of the accident, Marquis, Jennifer and Keith went to the area of the crash to check on the other vehicle. When Marquis arrived, he saw the driver of the crashed vehicle bleeding, with the airbags deployed. Marquis indicated that the vehicle was noisy and smoking from the front. Marquis and Keith both asked the driver some questions, but according to them, the driver was not making sense. Keith described Colton as "very disoriented." (Tr. at 70).

{¶29} Jennifer was a nurse, so she got into Colton's vehicle and helped stabilize Colton's head/neck until emergency services responded. Upon arrival, emergency services noted that Colton was trapped in the vehicle, that he was semi-conscious, had a large "goose egg" on his head, and that Colton did not know the place and time. (Tr. at 123). Firefighters employed a "hydraulic spreader" to extricate Colton from the vehicle. He was taken to Marion General Hospital, but he had to be transferred to another hospital because Marion General was not a trauma hospital.

{¶30} Shortly after the crash, after midnight on June 4, 2020, David Bailey was walking around his cul-de-sac to deal with medical issues. He lived near the Warners. Despite the fact that he was wearing headphones and listening to music, he heard a very loud noise approaching and saw a black Jeep Wrangler coming up his road. According to him, the vehicle was making "all kinds of noise." (Tr. at 126). He stressed that it was "[r]eal loud[.]" (*Id.*) David watched the Jeep Wrangler pull into the Warners' garage and the garage door closed behind it. David did not see who was driving the vehicle.

{¶31} According to testimony, the Warners' residence was approximately 5.5 miles from the crash site. The Warners made no calls and sent no text messages regarding the accident over the next 8 hours.

{¶32} At 8:06 a.m. on June 4, 2020, Jason sent a text message to an employee at the Marion County Common Pleas Court stating that he had a personal issue that

5

he had to deal with and that he would not be at work. Jason was an elected common pleas court judge. He asked if another judge could cover his docket for the day.

{¶33} Around 9:30 a.m. on June 4, 2020, Jason and Julia willingly went to the police to report the accident and were transferred to the Ohio State Highway Patrol, which was handling the crash investigation. Jason and Julia met with Marion Post Commander Troy Sexton of the State Highway Patrol. At that time, Julia admitted she was driving the vehicle during the crash. She filled out a written statement indicating that she thought there was a stop sign in the other direction and that after the crash she panicked and drove away. When questioned by Commander Sexton, Julia denied being impaired at the time of the crash, though she admitted to having three drinks that night, ending as late as 10 p.m.

{¶34} Commander Sexton testified that he did not give Julia a field sobriety test during the interview because he did not feel she was impaired at the time of the interview. He also did not administer a blood test because there was a time restriction on law enforcement wherein they were expected to get any alcohol or drug results after a crash and they were past the time limit. (Tr. at 198). However, the Warners gave law enforcement permission to go to their residence and inspect the Jeep, collect evidence, and take DNA samples.

{¶35} At 12:47 p.m. that same day, Jason sent a text message to the other elected judge of the Marion County Common Pleas Court, and to some of the staff members of the court. The text stated that Jason and Julia had been in a "pretty serious car accident." (State's Ex. 46). Jason stated that Julia failed to yield and hit another vehicle, and that, "in a hysterical panic, [she] drove away from the scene of the accident. After a long discussion that went on throughout the night, we agreed that we needed to go in and report it, which we did this morning." (*Id.*)

{¶36} On the same day that the Warners reported the accident, law enforcement officers went to the Warners' residence to take pictures of their damaged Jeep Wrangler. The Jeep was in the garage when officers arrived, and after they took initial photographs, they asked Jason to back the Jeep out of the garage. Jason did so, with some difficulty. One officer noted that the damage to the driver's-side front tire would have made the vehicle extremely difficult to drive. Testimony indicated that the "rim ha[d] been separated from the tie rod end underneath the fender well." (Tr. at 205). Photographs of the Warners' Jeep showed extensive damage to the left front wheel, including a deflated tire. There was also "buckling * * * on the left front fender above the wheel well." (State's Ex. 23). Due to the deflated tire, there were marks in the road and in the driveway leading to the Warners' garage from where the rim had scraped the asphalt. There were additional marks made when the vehicle was pulled out of the garage.

{¶37} With the Warners' permission, law enforcement officers collected the airbags that had deployed from the vehicle. DNA samples were taken from each

6

airbag. DNA consistent with Julia's was found on the driver's-side airbag, and DNA consistent with Jason's was found on the passenger's-side airbag. Julia also had bruising consistent with the driver's-side seatbelt. Once officers were done with the vehicle, it was towed to Buckeye Collision.

{¶38} The next day, June 5, 2020, Jason returned to work. That day, he had a meeting scheduled with the other Marion County Common Pleas Court Judge, Judge Edwards, about court matters unrelated to the crash. Following the meeting, Judge Edwards asked to speak with Jason privately about the accident, because the local chief of police had indicated that Jason might have been the driver of the vehicle in the crash, which was contrary to what Jason had said in his text message to Judge Edwards.

{¶39} Jason denied being the driver, and told Judge Edwards that he was "passed out" when the collision occurred. (Tr. at 433). According to Judge Edwards, after Jason said the words "passed out," it "was almost like his tongue came out of his mouth and tried to grab the words and pull them back in. And [Jason] said instead that he was asleep. [Jason] said: Well, you know, asleep." (*Id.*)

{¶40} Jason told Judge Edwards that he was awakened by the impact, that he recalled looking up and seeing his wife bleeding from her nose, and that he then remembered the sound of the Jeep Wrangler pulling off. Judge Edwards indicated that it left him with the impression that Jason was sleeping through most of the incident. Further, Judge Edwards testified that he felt that was the impression Jason wanted him to have from the conversation.

{¶41} Later that same day, Judge Edwards went to Buckeye Collision to check on a vehicle he was having restored there. While there, he saw the Warners' Jeep Wrangler in the parking lot, which he was familiar with. Judge Edwards was "shocked" at the damage, especially to the driver's side front wheel. (Tr. at 437). It caused him to question how Jason could have been asleep. He also noticed the airbags had been removed from the vehicle, and he sent Jason a text message to ask who had removed them, thinking that it could be tampering with evidence if Jason had done it, but the airbags had been removed by law enforcement.

{¶42} In the week following the accident, Colton was released from the hospital. However, he was having significant memory issues that required him to stay with his family. While Colton was staying with his family, and not present at the apartment he rented, a letter was dropped off that was written by Julia apologizing for the accident. She stated she was very sorry, that she did not want Colton to think she was "crazy, or drunk, or insensitive." (State's Ex. 41). She stated that it was not like her to misjudge a turn in the dark and the rain, and that it was not like her to "freak out" and "panic and leave[.]" (*Id.*)

7

{¶43} From June 9, 2020, to June 17, 2020, Julia and Jason went on a pre-scheduled vacation with the Andersons to Texas. According to the Andersons, the accident was never discussed.

{¶44} On June 19, 2020, just over two weeks after the accident, a televised news story aired about the crash. The story contained information that witnesses in the area of the accident saw a man exit the Jeep Wrangler at the crash site. Judge Edwards saw the news story and sent a text message to Jason about it because Jason had not indicated he had gotten out of the Jeep at the scene previously. Rather, Jason had left Judge Edwards with the impression that he had been sleeping. When asked by Judge Edwards, Jason acknowledged getting out of the Jeep. Judge Edwards asked Jason if Jason had informed disciplinary counsel about the incident, and Jason responded that he did not think he had done anything wrong.

{¶45} Over the ensuing months, Colton went through physical therapy and had various medical issues including memory problems, a concussion, a kidney tear, cellulitis, knee/walking problems, and bell's palsy. The parties stipulated at trial that he suffered serious physical harm as a result of the accident.

*Id*. at \*5–\*9.

As set forth above, a retired visiting Judge, Hon. Patricia A. Cosgrove, conducted the three-day bench trial in March 2021. The Court convicted Petitioner of Complicity to Leaving the Scene of an Accident in violation of O.R.C. §§ 2923.03(A)(2) and 4549.02(A)(1)/(B)(2)(b), a fourth degree felony and Complicity to Tampering with Evidence in violation of O.R.C. §§ 2923.03(A)(2) and 2921.12(A)(1), a third degree felony. The court dismissed two other charges against Petitioner.

On April 15, 2021, Judge Cosgrove sentenced both Petitioner and Mrs. Warner to twenty-four months incarceration on the Tampering with Evidence Count; a concurrent sentence of eighteen months on the Leaving the Scene Count; and three years of post-release control. (Doc. 11-4, PgID.1642–43).

Petitioner appealed his conviction to the Marion County Court of Appeals (Third District). *State v. Warner,* No. 2021-Ohio-4812, 2021 WL 5563502 (Third App. Dist. Nov. 29, 2021).

8

The appellate court overruled all four assignments of error, upheld the conviction and dismissed the appeal. *Id.*

The Ohio Supreme Court declined to exercise jurisdiction over a further appeal. *State v. Warner*, No. 2021-1458, 184 N.E.3d 158 (Ohio 03/29/2022).

**Legal Standard**

The AEDPA limits the authority of a federal district court to grant habeas relief on a claim that the state court adjudicated on the merits. *See* 28 U.S.C. § 2254(d). A § 2254(d) petition may only be granted if the state court adjudication was "contrary to" or resulted in an "unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States." § 2254(d)(1).

The standard's focus "is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). "AEDPA thus imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal citations and quotation marks omitted).

Ultimately, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of [the state court's] decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Additionally, a state court's factual determinations are presumed correct on federal habeas review, 28 U.S.C. § 2254(e)(1), and review is "limited to the record that was before

9

the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

## Discussion

As noted above, Petitioner asserts three claims for habeas relief. For the reasons that follow, I find no merit to any of them. I discuss each in turn.

### 1. The Evidence Sufficed to Support the Conviction

Petitioner argues that there was insufficient evidence to support his conviction. (Doc. 1, PgID. 6). He explains, "[t]hough the record reflects that Petitioner was present when the crimes were committed, none of the testimony or evidence adduced at trial supported a finding that he was complicit in those offenses." (*Id*.).

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979) (internal citation and footnote omitted).

The sufficiency of the evidence standard "must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law," *Id*. at 324 n. 16, and through the framework of 28 U.S.C. § 2254(d). *Martin v. Mitchell*, 280 F.3d 594, 617 (6th Cir. 2002).

Thus, under the AEDPA, challenges to the sufficiency of the evidence "must survive two layers of deference to groups who might view facts differently" than a reviewing court on habeas review– the factfinder at trial and the state court on appellate review– as long as those determinations are reasonable. *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009).

The Supreme Court has explained that a district court cannot reweigh the evidence on habeas review: "28 U.S.C. § 2254(d) gives federal habeas courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them." *Marshall v. Lonberger*, 459 U.S. 422, 435 (1983).

I apply this standard to the factual determinations that are "fairly supported by the record" within the meaning of 28 U.S.C. § 2254(d). I find that the evidence was sufficient to convict Petitioner of Complicity for Leaving the Scene of an Accident and Complicity for Tampering with Evidence.

As discussed, the trial court convicted Petitioner of "Leaving the Scene of an Accident/ Complicity" under Ohio Rev. Code § 4549.02(A)(1)/(B)(2)(b) and Ohio Rev. Code § 2923.03(A)(1) – (A)(2) as well as "Tampering with Evidence/Complicity" under Ohio Rev. Code. § 2921.12(A)(1) and Ohio Rev. Code § 2923.03(A)(2).

The Leaving the Scene statute states:

> (A)(1) In the case of a motor vehicle accident or collision with persons or property on a public road or highway, the operator of the motor vehicle, having knowledge of the accident or collision, immediately shall stop the operator's motor vehicle at the scene of the accident or collision. The operator shall remain at the scene of the accident or collision until the operator has given the operator's name and address and, if the operator is not the owner, the name and address of the owner of that motor vehicle, together with the registered number of that motor vehicle, to all of the following:
>
> (a) Any person injured in the accident or collision;
>
> (b) The operator, occupant, owner, or attendant of any motor vehicle damaged in the accident or collision;
>
> (c) The police officer at the scene of the accident or collision.
>
> ***

> (B)(1) Whoever violates division (A) of this section is guilty of failure to stop after an accident. Except as otherwise provided in division (B)(2) or (3) of this section, failure to stop after an accident is a misdemeanor of the first degree.
>
> (2) If the accident or collision results in serious physical harm to a person, failure to stop after an accident is whichever of the following is applicable:
>
> \*\*\*
>
> (b) If the offender knew that the accident or collision resulted in serious physical harm to a person, a felony of the fourth degree.

Ohio Rev. Code § 4549.02(A)(1).

The Tampering statute states:

> (A) No person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall do any of the following:
>
> (1) Alter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation[.]

Ohio Rev. Code. § 2921.12(A)(1).

The Complicity statute states: "(A) No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following: […] (2) Aid or abet another in committing the offense." Ohio Rev. Code § 2923.03(A)(2).

The Ohio Complicity statute does not define "aid or abet." The Ohio Supreme Court has explained its meaning:

> Black's Law Dictionary defines "aid and abet" as "[t]o assist or facilitate the commission of a crime, or to promote its accomplishment." Black's Law Dictionary (7 Ed.Rev.1999) 69.
>
> This court has held that "the mere presence of an accused at the scene of a crime is not sufficient to prove, in and of itself, that the accused was an aider and abettor." *State v. Widner* (1982), 69 Ohio St.2d 267, 269, 23 O.O.3d 265, 266, 431 N.E.2d 1025, 1027. This rule is to protect innocent bystanders who have no connection to the crime other than simply being present at the time of its commission.

*State v. Johnson*, 93 Ohio St. 3d 240, 243 (2001).

12

The Ohio Court of Appeals in this case explained that a conviction under the Complicity statute requires that the evidence show:

> the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal. Such intent may be inferred from the circumstances surrounding the crime." *State v. Johnson*, 93 Ohio St.3d 240, 245 (2001). Furthermore, "'[p]articipation in criminal intent may be inferred from presence, companionship and conduct before and after the offense is committed.'" *Id*. quoting *State v. Pruett*, 28 Ohio App.2d 29, 34, 57 O.O.2d 38, 41 (1971).

*Warner*, *supra*, 2021 WL 5563502, at * 10.

I have thoroughly reviewed the trial record. The prosecution met its burden and demonstrated more than Petitioner's "mere presence" at the crime scene. The prosecution demonstrated that Petitioner aided and abetted Mrs. Warner's crimes.

There is no dispute that Mrs. Warner was the driver at the time of the accident. Nor is there any dispute that witnesses saw her outside the car – at one point, as set forth, a witness saw her with her hand over her mouth as she looked into the BMW's interior. Likewise, there is no dispute that Petitioner got out of the vehicle. Witnesses saw him walking around the vehicle.

There is no dispute, after their apparently brief survey of the victim and his car, that Mrs. Warner returned to the driver's seat of their vehicle. Petitioner returned to the passenger side. They drove home, leaving marks on the road and in their driveway where the vehicle's rim scraped the pavement.

Once on their street, a neighbor saw their vehicle coming up the road, pull into the Warners' garage, and saw the garage door close behind them.

There is also no dispute that Mrs. Warner, by driving away from the scene, violated the Leaving the Scene statute. In addition, those acts, by making first-hand investigation of the accident scene

13

impossible, clearly violated the Tampering statute. Those acts sufficed to make her the principal *vis-à-vis* those crimes.

There is nothing in the evidence that suggests that there was any legal impediment to Petitioner remaining at the scene. Instead of doing so, he and his wife left.

Had Petitioner remained at the scene he could have told the responding officers what happened. He could, as well, have decided, whether to take a breathalyzer test.

More importantly, had Petitioner remained at the scene, I believe that under the totality of the circumstances, Mrs. Warner would likewise have remained at the scene, too.

Regardless of the consequences, had he done those things, the outcome for him and his wife would, possibly, have been different.

In his Petition, Petitioner argues that his case is similar to one where a bystander does nothing and therefore was not "aiding or abetting." (*See* Doc. 11, PgID. 1048–50).

I disagree entirely. Petitioner did not, as he contends, do nothing. Instead, he got back into the vehicle and accompanied his wife home during her continuing violation of Leaving the Scene and Tampering with the Evidence.

The Petitioner points to and emphasizes the fact that none of the witnesses heard any conversation between him and his wife before they left the scene. That that is so does not matter. His re-entering the vehicle sufficed to make him complicit in Mrs. Warner's crimes.

I cannot conceive of a more emphatic and forthright endorsement of Mrs. Warner's violations.

I reject, accordingly, Petitioner's challenge to the sufficiency of the evidence.

### 2. The Verdicts Were Not a Legal Impossibility, Contrary to Law, Nor Did They Violate Petitioner's Rights to Due Process and a Fair Trial

Petitioner next argues that the verdicts were a legal impossibility, contrary to law, and violated his rights to due process and a fair trial. (Doc. 1, PgID. 8). He argues:

> [t]he record demonstrates that only one individual committed the offenses of Leaving the Scene and Tampering With Evidence. It further demonstrates that this individual must have been this Petitioner or his wife. The trial court found that both Petitioner and his wife were complicit in those offenses, and were therefore both principal and complicitor simultaneously.

(*Id.*).

In Petitioner's Traverse, he further explains:

> In the interest of clarity, Petitioner does not claim that convictions for complicity are unlawful, unconstitutional, or otherwise inform by virtue of no principal being identified, charged, or convicted. That is a non-issue in this case. Rather, the issue is whether a finder of fact may determine that an individual is both guilty and not guilty of the same indicted offense without violating a defendant's rights to due process, a fair trial, and to be free from double jeopardy.

(Doc. 11, PgID. 1053).

Solely for the purpose of this Opinion, I accept, without deciding, that a single act can constitute either acting as a principal or as a complicitor.

In this case, that does not matter. The fact that the Judge, for whatever reason, gratuitously referenced Petitioner and his wife as "aid[ing] and abett[ing] one another" is immaterial. (Tr. 538, Doc. 11-3, PgID. 1156). It had no bearing or effect on the propriety of his conviction as a complicitor and not as a principal.

So, I reject the Petitioner's come-lately contention that this harmless error on the Judge's part somehow created a legal impossibility – namely that one can be both a principal and a complicitor.

I accordingly reject Petitioner's second grounds for habeas relief.

15

### 3. The Trial Court's Conduct Did Not Violate Petitioner's Rights to Due Process and a Fair Trial

Lastly, Petitioner argues that the trial court's repeated misconduct violated Petitioner's right to due process and a fair trial. (Doc. 1, PgID. 9).

He explains,

> [d]uring Petitioner's sentencing hearing, the trial court indicated that it had conducted an independent investigation and utilized its findings to evaluate Petitioner's mental state, and thus his guilt. Moreover, the trial court acknowledged that it was giving no weight to mitigation factors that it was required to consider under Ohio law.

(*Id.*).

In his Traverse, he explains further:

> In this case, the trial court directly admitted that it obtained evidence outside the record and used it to reach determinations concerning essential elements of the offenses. Though the trial court never directly acknowledged the specific time that it conducted its extrajudicial investigation, the record clearly reflects that it did so during the guilt phase of Petitioner's trial.

(Doc. 11, PgID. 1055–56).

Habeas law is well-settled that errors during the course of sentencing are not cognizable in these proceedings. *See, e.g., Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991). Accordingly, I reject Petitioner's third assignment of error.

So far as I can tell, there was only one instance in which the Judge alluded to having gone outside the record: namely, when she checked Petitioner's docket and determined that he had handled a dozen or so drunk driving cases as a Judge.

That single instance did not taint the trial, the verdict, or the sentence.

To the extent that this confirmed Petitioner's awareness of the six-hour point at which officers will not administer a breathalyzer, the Court's doing so was immaterial. Petitioner waited upwards

16

of nine hours after the accident to contact the authorities. In light of that fact, whatever Petitioner knew from his time as a Judge (or as a prosecutor) was meaningless. It had no effect on the trial, the verdict, or the fundamental fairness of either.

Finally, there is no merit to the Petitioner's contention that the Court failed to touch all the statutory factors when pronouncing the sentence. While the Judge could have been more explicit, it was not necessary for her to have been so. One must, and properly should, take her at her word – namely, that she considered all the necessary factors.

### Certificate of Appealability

Under 28 U.S.C. § 2253, "a state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition." *Miller-El v. Cockrell*, 537 U.S. 322, 326 (2003). An unsuccessful habeas petitioner "must first seek and obtain a [certificate of appealability] from a circuit justice or judge," as a jurisdictional prerequisite.

Federal law authorizes me to issue a certificate of appealability only if the Petitioner "has made a substantial showing of the denial of a constitutional right." *See* 28 U.S.C. § 2253(c)(2).

I have carefully reviewed the record in this case, including the original pleadings, trial record, and appellate record. I find that Petitioner does not meet the requirement that he show that he was denied a constitutional right. I therefore deny Petitioner a certificate of appealability.

### Conclusion

The trial court fairly tried and convicted Petitioner and likewise there is no error that affected anything during his sentencing.

It is, therefore, ORDERED THAT:

1. Petitioner's Petition (Doc. 1) be, and the same hereby is, denied; and

2. I deny Petitioner a Certificate of Appealability.

SO ORDERED.

DATE: 7/3/2024

<u>/s/James G. Carr</u><br>Sr. U.S. District Judge